OLLIS BROTHERS, INC., JAMES D. OLLIS, TAX MATTERS PERSON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ollis Bros. v. Commissioner
Docket No. 27720-90
United States Tax Court
T.C. Memo 1994-121; 1994 Tax Ct. Memo LEXIS 129; 67 T.C.M. (CCH) 2465; March 28, 1994, Filed *129 Decision will be entered for respondent. For petitioner: Barry A. Furman and Georgeann R. Fusco. For respondent: Michael D. Baker. CLAPP
CLAPP
MEMORANDUM OPINION CLAPP, Judge: By notice of final S corporation administrative adjustment (FSAA), respondent determined a $ 61,235 adjustment to the S corporation return of income of Ollis Brothers, Inc. (Ollis Brothers or the corporation) for the 1985 taxable year. This adjustment resulted from respondent's determination that Ollis Brothers had omitted gross receipts from its corporate tax return. On December 10, 1990, petitioner, James D. Ollis (petitioner or James), filed a petition as tax matters person for readjustment of S corporation items. On November 19, 1991, petitioner filed a petition for adjustment of S corporation items under section 6228 for the year 1989 should the Court determine that the corporation's alleged theft loss was not discovered until 1989. This case was consolidated with the case at docket No. 26803-91 for purposes of trial, briefing, and opinion. The cases are now severed, and the case at docket No. 26803-91 involving the 1989 tax year is dismissed for lack of jurisdiction. [1]
*130 Ollis Brothers is an S corporation that was subject to the unified audit and litigation procedures for subchapter S items under sections 6221-6233 and 6241-6245 originally enacted as part of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, sec. 402(a), 96 Stat. 324, 648, [2] for its 1985 tax year. The sole issue for decision is whether Ollis Brothers is entitled to claim a theft loss deduction for 1985. We hold that the corporation is not entitled to a theft loss deduction. All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. Some of the facts have been stipulated and are found accordingly. We incorporate by reference the stipulation of facts and attached exhibits. *131 Ollis Brothers' principal place of business at the time the petition was filed was Collingdale, Pennsylvania. BACKGROUND Ollis Brothers is incorporated in Pennsylvania. The corporation is in the business of selling, installing, and repairing garage doors. During the year in issue, Ollis Brothers was owned by James and his brother, Edward Ollis (Edward), each owning a 50-percent interest. In addition to James and Edward, the corporation employed three other members of the Ollis family and three unrelated persons, including Margaret Hyde (Hyde), the corporation's receptionist and bookkeeper. James' responsibilities included managing the office, installing new garage doors for both residential and commercial clients, and repairing garage doors. Edward's primary responsibility was repairing garage doors. All other employees except Hyde worked as garage door mechanics. Ollis Brothers paid George Fair (Fair), an accountant, to come in once a month to review its books and records. Fair's duties included preparing the payroll taxes and yearend statements, checking the corporation's bank book, posting the general ledger, and preparing tax returns for the corporation. James and *132 Edward hired Hyde in 1976. Hyde had some previous bookkeeping experience and had held several jobs as a receptionist. Her responsibilities as receptionist and bookkeeper included answering the telephones, dispatching work, collecting mail from the post office, maintaining accounts receivable, accounts payable, and payroll accounts. She also was responsible for filing, typing, posting checks to the ledgers, and depositing company checks. One of Hyde's duties was to bill the corporation's customers after work was completed. Hyde used a system of bookkeeping that permitted someone, whose identity the record leaves unclear, to remove funds from the corporation. Hyde did not record on the corporation's books all of the payment checks it received from customers. She deposited checks that were recorded on the corporation's books into its checking account and cashed checks that were not recorded. Apparently personnel at the bank permitted Hyde to cash the corporate checks despite the fact that this was against bank policy. In cases where the corporation's customers paid in cash, and that cash was not deposited into its account, it is unclear whether the person who received the cash *133 failed to turn it over to Hyde or whether Hyde failed to deposit the cash that was turned over to her. This bookkeeping system was facilitated by the use of two sets of invoices: one set of "real" invoices and one set of "dummy" invoices. Checks from customers billed using the real invoices were recorded on the corporation's books and were deposited into its account. Checks from customers billed using the dummy invoices were not recorded on the books and were cashed. As the real invoices were in numerical order and coincided with the amounts recorded on the corporation's books, Fair never discovered the dual bookkeeping system. At some point during Hyde's employment with Ollis Brothers, the corporation began using a system of file cards, referred to as "warranty cards". Ostensibly, these cards were used to keep track of the warranties on new garage door installations. However, because the warranty cards also included payments made by customers who were not recorded on the books, the cards served as a nearly complete record of the corporation's customers and payments received from those customers. Hyde kept the dummy invoices in her desk in the corporation's office along with *134 the corporation's books and records. The warranty cards were kept in a box on top of the office file cabinet. James and Edward had access to the office and Hyde's desk at all times. Nevertheless, James maintains that he was not aware of the dual bookkeeping system until after Hyde's departure from the corporation. In 1985, Hyde endorsed and cashed corporate checks totaling $ 61,235. In September or October 1985, James met with the manager of Ollis Brothers' bank and asked a variety of questions about how the corporations's checks were being handled by the bank. The bank manager then discovered that checks made payable to Ollis Brothers were being cashed for Hyde primarily by one teller. In October 1985, James and Edward fired Hyde, claiming that she had embezzled money from the corporation. It is unclear whether she was informed of the reason for her dismissal. During the final days of her employment, Hyde transcribed a list of customers from the warranty cards (the customer list), believing that this would help protect her if Ollis Brothers ever were audited. The list is comprised of the customers who were billed with the dummy invoices and whose payments were not recorded *135 on the corporation's books. When she left Ollis Brothers, Hyde took with her the list of customers that she had transcribed and a few of the warranty cards. The corporation paid Hyde for 2 weeks of vacation. James testified that, shortly after Hyde left the corporation, he examined its books, records, and the warranty cards and estimated that the amount that Hyde had allegedly embezzled from the corporation did not exceed $ 10,000. James and Edward did not contact the police regarding Hyde's alleged embezzlement. When they received notification that Hyde had applied for unemployment compensation, they consulted their lawyer, Leonard Sloane (Sloane), about whether they should contest the claim for unemployment compensation and whether they should report her to the police or file a claim against her. They discussed with Sloane few details of their suspicions about Hyde and did not present him with any tangible evidence to support their allegations. Sloane suggested that it probably would not be worth the trouble to report her to the police, or to bring a lawsuit against her, and that they should not contest her claim for unemployment compensation. James and Edward followed Sloane's *136 advice. Fair prepared the corporation's 1985 corporate income tax return, reporting $ 12,220 of ordinary income. Although James had informed Fair that Hyde had embezzled funds from the corporation, Fair neither included the missing funds in its gross income nor claimed a theft loss deduction, because he believed that the amounts would simply offset each other. Approximately 2 years after Hyde was fired from her job with the corporation, she discussed with her neighbor, a former Internal Revenue Service (IRS) special agent, her experience working for Ollis Brothers and showed him the customer list and warranty cards she had taken from the corporation. Hyde then was contacted by two special agents from the IRS. The Criminal Investigation Division of the IRS eventually forwarded the information it had received from Hyde to the Examination Division to determine its accuracy, and Revenue Agent Deborah Phillips began an examination of Ollis Brothers. During her on-site audit of the corporation, Agent Phillips asked James and Fair if any income had been omitted from the corporation's 1985 income tax return. Neither James nor Fair mentioned the missing income for that year or Hyde's *137 alleged embezzlement. Agent Phillips reviewed Ollis Brothers' books, records, and income tax return for 1985. Finding no discrepancies, she compared the customer list Hyde had provided with the corporation's books and discovered that the customers on that list were not recorded. Agent Phillips sent letters to several of the customers on the list to verify that they were in fact customers of the corporation. By January 1989, she had received confirmation of the customer list and calculated that Ollis Brothers had received additional gross receipts of $ 61,235 in 1985. She met with Fair in May 1989, and informed him of her findings. It was at this meeting that Agent Phillips was first informed that James and Edward knew that income had not been reported and that they blamed Hyde for its theft. Fair reported Agent Phillips' calculation of the amount of omitted gross receipts to James and Edward. Later that year, Agent Phillips analyzed James' and Edward's personal accounts using the bank deposits and expenditures method and eventually concluded that the amounts deposited, plus any cash not deposited into their accounts, exceeded what they had available from taxable and nontaxable *138 sources. The Criminal Investigation Division of IRS eventually decided not to pursue a criminal case against James and Edward since the available evidence focused only on 1985 and did not demonstrate a 3-year pattern of fraud. DISCUSSION Petitioner does not contest respondent's determination of the omission of $ 61,235 from its gross receipts. Rather, petitioner claims that Hyde embezzled from the corporation and that it is entitled to a theft loss deduction. Respondent argues that Edward and James fabricated the story about Hyde's embezzlement to conceal the fact that they were skimming money from Ollis Brothers. Respondent presented evidence casting doubt on petitioner's allegations regarding Hyde and maintained that Hyde was simply a pawn in Edward and James' scheme to divert income from the corporation. Respondent alleges that, not long after Hyde began working for the corporation, James and Edward taught Hyde their system of recording only certain checks on the corporation's books; they instructed her to cash the unrecorded corporate checks for them; and they introduced her to the teller at the bank who permitted them to cash those checks. In cases where Ollis Brothers' *139 clients paid in cash, respondent alleges that James or Edward retained the cash. Respondent contends that, in March 1985, James became concerned about the amount of money the brothers were taking from the corporation and told Hyde to stop cashing corporate checks for more than $ 40. Respondent alleges that, without James' knowledge, Edward insisted that Hyde continue to cash larger checks for him. Respondent maintains that, in October 1985, James became aware of Edward's actions and fired Hyde. Based on this theory of the events leading up to Hyde's termination, respondent argues that Ollis Brothers is not entitled to a theft loss deduction. Section 165(a) allows a deduction for "any loss sustained during the taxable year and not compensated for by insurance or otherwise." Concerning theft losses, section 165(a) is applicable for the year "in which the taxpayer discovers such loss." Sec. 165(e). Deductions are strictly a matter of legislative grace and petitioner bears the burden of proving it is entitled to any deductions claimed. Rule 142(a); New Colonial Ice Co. v. Helvering, 292 U.S. 435 (1934). In order to claim a theft loss, it is incumbent *140 upon petitioner to establish, among other things, that: (1) A theft occurred under applicable State law, Bellis v. Commissioner, 540 F.2d 448 (9th Cir. 1976), affg. 61 T.C. 354 (1973); Citron v. Commissioner, 97 T.C. 200, 207 (1991); and (2) there is no reasonable prospect for reimbursement or recovery with respect to the theft. Citron v. Commissioner, supra; sec. 1.165-1(d)(3), Income Tax Regs.
The law of the jurisdiction where the loss is sustained is applicable to determine whether a theft or embezzlement has occurred. Luman v. Commissioner, 79 T.C. 846, 860 (1982). Pennsylvania law provides in relevant part: Theft by failure to make required disposition of funds received (a) Offense defined. -- A person who obtains property upon agreement, or subject to a known legal obligation, to make specified payments or other disposition, whether from such property or its proceeds or from his own property to be reserved in equivalent amount, is guilty of theft if he intentionally deals with the property obtained as his own and fails *141 to make the required payment or disposition. The foregoing applies notwithstanding that it may be impossible to identify particular property as belonging to the victim at the time of the failure of the actor to make the required payment or disposition. [18 Pa. Cons. Stat. Ann. sec. 3927(a) (1983).] After reviewing all of the evidence in this case, we conclude that petitioner has not established that a theft occurred under Pennsylvania law. Those who testified on the corporation's behalf told a plausible story and presented some evidence to support their assertions. For example, the bank manager's testimony that James came in on several occasions in the fall of 1985 to question how certain checks from customers had been handled seems to suggest that James was not aware prior to that time that corporate checks were being cashed. Similarly, Ollis Brothers' lawyer, Sloane, testified that not long after Hyde was fired, James appeared in his office visibly upset and wondering whether he should contact the police. Nevertheless, there were several critical gaps and contradictions in the version of events presented by petitioner's witnesses. Why did James and Edward not make more *142 of an effort to ascertain the exact amount embezzled? Why did James not notice that at least 119 of the corporation's clients were not listed on the books despite the fact that, according to his own testimony, he regularly reviewed the corporation's books? Why would Hyde ever talk to the IRS if she alone had been embezzling from Ollis Brothers? If he was not culpable, why did James fail to mention Hyde's alleged embezzlement to Agent Phillips when confronted with direct questions about the amount of income reported on the corporation's 1985 return? In addition, we find it troubling that petitioner did not call Edward to testify despite the fact that, according to James' testimony, Edward played a critical role in uncovering Hyde's alleged embezzlement. We can assume only that petitioner failed to call Edward as a witness because his testimony would have been unfavorable. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). We note that the above conclusion does not mean that respondent has succeeded in convincing us that James and Edward were diverting funds from *143 the corporation. The witnesses who testified for both sides generally seemed credible; however, the evidence simply did not preponderate toward either version of events. Consequently, we must conclude that petitioner has not carried his burden, and Ollis Brothers is not entitled to a theft loss deduction. Petitioner argued at trial and on brief that respondent should be precluded from using bank deposits and expenditures analyses to determine whether James and Edward diverted funds from the corporation. Petitioner contends that respondent was able to determine the amount of the deficiency using only the corporation's journals, tax returns, and other records; thus, the use of bank deposits and expenditures analyses was unnecessary. In addition, petitioner argues that respondent's decision to undertake these analyses was untimely and prejudicial. Petitioner's contention that respondent was able to determine the amount of the deficiency by reviewing records that petitioner provided is incorrect. As the corporation's books, records, and tax returns did not clearly reflect its income, respondent reconstructed its income by using the customer list that Hyde provided and by contacting *144 customers on that list. Respondent used the bank deposits and expenditures method to corroborate evidence of specific payments made to Ollis Brothers. United States v. Tafoya, 757 F.2d 1522, 1528 (5th Cir. 1985); United States v. Horton, 526 F.2d 884, 886-887 (5th Cir. 1976). Accordingly, we do not find respondent's use of the bank deposits and expenditures method to be improper. The evidence demonstrates that petitioner's counsel was informed of respondent's intention to examine James' and Edward's personal bank accounts in 1989, while respondent's investigation was still underway. Under these circumstances, we reject petitioner's claim that respondent's use of the bank deposits and expenditures method was untimely and prejudicial. Similarly, we do not find that the bank deposits method was a new matter in the case requiring respondent to amend her answer. To reflect the forgoing, Decision will be entered for respondent. Footnotes
1. Ollis Brothers is a small S corporation within the meaning of sec. 301.6241-1T(c)(2), Temporary Proced. & Admin. Regs., 52 Fed. Reg. 3003 (Jan. 30, 1987). Petitioner at docket No. 26803-91 failed to show that for the corporation's 1989 tax year he had made an election under sec. 301.6241-1T(c)(2)(v)(A), Temporary Proced. & Admin. Regs., supra↩, to have the tax treatment of corporate items determined at the corporate level. Thus the unified audit and litigation procedures originally enacted as part of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, sec. 402(a), 96 Stat. 648, are not applicable.
2. Sec. 6244 provides that the TEFRA provisions relating to the assessment and determination of partnership items are extended to the assessment and determination of subchapter S items.↩